PEOPLE *ex rel.* FRANK *v.* THE BOARD OF SUPER-VISORS OF THE CITY AND COUNTY OF SAN FRANCISCO.

THE corporation, the City of San Francisco, was not destroyed by the Consolidation Act, but continued.  Its name only was changed, and the change in this respect did not require any alteration in the pleadings or any suggestion of record in an action pending against the city at the time the act was passed.

Where an action was commenced against the City of San Francisco previous to the passage of the Consolidation Act, but judgment was not recovered until after the passage of the said act : *Held,* that the judgment was binding against the existing corporation, the City and County of San Francisco.

The provisions of the fourth section of the Consolidation Act, respecting the preëxisting indebtedness of the City of San Francisco, was not a mere legislative declaration of good faith towards the public creditors, but a requirement imposing upon the Board of Supervisors the duty of providing for the payment of that indebtedness.

The Board of Supervisors of the City and County of San Francisco have authority, and it is their duty to provide for the payment of judgments recovered against the City of San Francisco.  They have no discretion except between two courses of procedure.  They must either appropriate for this purpose money already in the treasury, or they must raise the money by taxation.

*Mandamus* is the appropriate remedy to enforce the performance of this duty by the Board of Supervisors.

There being no discretion as to the duty to be performed there is none as to the use of the means required in performing it.  If the means require the passage of an ordinance, the Supervisors have no discretion to refuse to pass the ordinance.  They have not in such case the right to vote at their option either for or against the ordinance.

Section ninety-five of the Consolidation Act, with reference to auditing claims, does not apply to judgments recovered upon the preëxisting indebtedness of the city.

The restrictive clauses of that section and of other sections of the act must be read in connection with the fourth section and receive such a construction that the provisions of all may stand.

In imposing upon the Supervisors the duty of providing for the payment of the city indebtedness, the Legislature authorized them to take all the ordinary

measures essential to its complete performance.   The duty carries with it the means.   The Board can appropriate from the revenues or levy a tax, and the adjusting of the details is a mere matter of administration, which can be had under the direction of any of the officers of the corporation designated for that purpose.

APPEAL from the Twelfth Judicial District.

This was an application for a writ of *mandamus* to compel the defendants to make provision, from the revenues of the City and County of San Francisco, for the payment of a certain judgment obtained against the City of San Francisco, and in case said revenues are insufficient for said purpose, to levy a tax for the payment thereof, as provided in section four of an act entitled " An Act to Repeal the several Charters of the City of San Francisco, to establish the Boundaries of the City and County of San Francisco, and to Consolidate the Government thereof," approved April 19th, A. D. 1856.

The cause was heard upon the affidavit of the relator and the answer of the defendants.   The affidavit of the relator sets forth:

1st.  That on the eighteenth day of December, 1854, the City of San.Francisco was indebted to one Henry W. Seale, in the sum of $58,611 39 ;

2d.  That on the fourteenth day of February, 1854, the said Seale instituted a suit against the City of San Francisco to recover said indebtedness ;

3d.  That on the twenty-seventh day of April, 1857, the Superior Court rendered a judgment against the said City of San Francisco, and in favor of Seale, for the said sum, with interest thereon from the eighteenth day of December, 1554 ;

4th.  That said suit was afterwards appealed by the said City of San Francisco to the Supreme Court of the State of California, and that on the third day of July, 1860, said judgment was confirmed by the Supreme Court, with costs, and is now final and unpaid ;

5th.  That said debt was due by the City of San Francisco at the time when the Consolidation Act (passed April 19th, 1856) was approved ;

6th. That in and by said Consolidation Act all the property of every kind and nature belonging to the City of San Francisco became the property of the City and County of San Francisco, that it was received and accepted by said city and county and has ever since been used by said city and county;

7th. That there is, and at the time of the demand made by the relator was, in the treasury of the City and County of San Francisco, of the revenue of the fiscal year ending June, 1862, a large amount of money, more than sufficient to pay the amount due upon said judgment, unspent and unappropriated;

8th. That said judgment has been duly assigned to the relator (the assignments are specially set forth), and that he now is, and at the time of making his demand was, the owner of said judgment;

9th. That the relator, on the twentieth day of October, 1862, duly demanded of the said Board of Supervisors of the City and County of San Francisco, in a regular and public session of said Board, to make provision for said indebtedness according to the provisions of section four of the Consolidation Act;

10th. That said Board of Supervisors has neglected, delayed, and refused to do so; and

11th. That there is not any plain, speedy, and adequate remedy to the relator save by the writ of mandate in such cases made and provided.

The answer of the defendants contains:

1st. A denial upon information and belief that the City of San Francisco was indebted to Seale in any sum on the eighteenth day of December, or at any other time;

2d. An admission of the commencement of the action at the time set up in relator's affidavit, and the rendition of the judgment as therein alleged;

3d. An averment that said judgment is null and void, because at the time of its rendition the charter of the City of San Francisco had been repealed, and that the corporation known as the City of San Francisco had no legal existence;

4th. An admission that the judgment was appealed to the Supreme Court, and there affirmed as set up in relator's affidavit, and an averment that said appeal was unauthorized, because said City of

Frank *v*. City and County of San Francisco.

San Francisco had no legal existence, and no power to appeal, prosecute, or defend the said or any other action;

5th. An admission that said judgment is unpaid, and a denial that it is due;

6th. An allegation that defendants have no knowledge or information save what is contained in relator's affidavit, whether the relator is the owner and holder of said judgment, and that defendants neither admit nor deny the same, but that they insist that the relator shall be required to make strict proof thereof;

7th. An allegation that on advice and belief the Board of Supervisors have no power or authority to pay, or order paid, or audit, allow, or make provision for the payment of said judgment;

8th. A plea in the nature of a demurrer to the demand alleged by relator; and

9th. An allegation that at the time when the said affidavit of the said relator was made, namely: at the time when the said proceedings in this behalf were instituted and commenced—there were and still are outstanding and unpaid claims against the late City of San Francisco of the like class, and of equal validity with the said judgment described by the said relator, to the amount of over $1,300,000—that is to say, judgments upon alleged claims against the said, the late, City of San Francisco, upon which the said, the late, City of San Francisco was duly impleaded before the passage of the said so-called Consolidation Act, and upon which judgments were thereafter obtained, after the passage of the so-called and described Consolidation Act, without the substitution of the said City and County of San Francisco upon the record, but upon consideration of law, justice, and equity, equal at least to those upon which the said judgment, described by the said relator, is founded.

The following are sections one and four of the act known as the Consolidation Act, which are referred to in the opinion of the Court:

" Sec. 1. The corporation, or body politic and corporate, now existing and known as the City of San Francisco, shall remain and continue to be a body politic and corporate, in name and in fact, by the name of the City and County of San Francisco, and by that name shall have perpetual succession, may sue and defend in all

Courts and places, and in all matters and proceedings whatever, and may have and may use a common seal; and the same may alter at pleasure, and may purchase, receive, hold, and enjoy real and personal property, and sell, convey mortgages, and dispose of the same for the common benefit.    The boundaries of the City and County of San Francisco, on all sides except the southern boundary, described in this section, shall be identical with those of the County of San Francisco as they exist at the time of the passage of this act. The southern boundary of the City and County of San Francisco shall be as follows : beginning in the boundary line of the County of San Francisco, as it now exists at a point due east from a rock in the bay of San Francisco, southwesterly from Point Devisidero or Hunter's Point, which rock is designated on Wheeler's map of said county as Shag Rock; thence running due west to said Shag Rock; thence running westerly to a point in the county road, one-fourth of a mile, northeasterly in a straight line from the house known as the County House, kept and occupied by C. E. Lilly; thence in a straight line to the south-eastern extremity of the southern arm of the Laguna de la Merced; thence due west to the Pacific Ocean, and thence due west to the western boundary of the County of San Francisco as it now exists; *provided, however*, that all rights and liabilities of the corporation heretofore and now known as the City of San Francisco shall survive to and continue against the corporations continued by this act."

" Sec. 4. All the existing provisions of law, defining the powers and duties of county officers, excepting those relating to Supervisors and Boards of Supervisors, so far as the same are not repealed nor altered by the provisions of this act, shall be considered as applicable to officers of the said City and County of San Francisco, acting or elected under this act.    Provision shall be made from the revenues of the said city and county, for the payment of the legal indebtedness of the former city corporation and of the County of San Francisco.    The taxes which may be levied and collected under the provisions of this act, shall be uniform throughout the said City and County of San Francisco ; but in case it should hereafter be found necessary, for the purpose of providing for the said city indebtedness, to increase taxation beyond the rate of the county

tax levied upon property in said County of San Francisco, during the year 1855, such increased taxation, over and above the rate aforesaid, shall be levied and assessed exclusively upon the real and personal property situated within the limits defined in the second section of the act entitled "An Act to Reincorporate the City of San Francisco," passed May 5th, 1855, and not upon such property situated without those limits."

The Court below refused to grant the writ, and gave judgment on the application for the defendants. From this judgment the relator appeals.

*John B. Felton* and *A. M. Crane*, for Appellant.

It will be perceived that none of the allegations of the answer contradicts the allegations of the complaint, or raises any question of fact. It is true that the original indebtedness, on which the judgment described in the relator's affidavit was rendered, is denied, but as the rendition of the judgment is admitted, the denial is evidently sham and evasive. By the force of the judgment of the highest tribunal of the land the indebtedness has become *res adjudicata*, and the defendants cannot deny it now. So, also, the defendants say that they neither deny nor admit the allegation that relator is the owner and holder of the judgment described in his affidavit, and insist on strict proof. But the relator's affidavit is positive upon the subject, and is a sworn complaint to which defendants must answer as to any other sworn complaint. Even at common law the rule was that the return to a *mandamus* must be certain and conclusive. This point was decided on the same sort of allegation in the very learned case of *Commonwealth ex rel. Thomas* v. *Commissioners of Alleghany County* (8 Casey, 32 Penn. 232), where the Court says: "The fourth plea is a sort of conjectural interrogatory as to whether the relator is a *bona fide* holder of the bonds he claims. His title is not exactly denied or admitted, but we are asked to put him to a proof of it. We cannot do it on so uncertain and equivocal a plea. He alleges positively that he is the owner, and until it is positively denied he cannot be required to prove his title."

Taking then the affidavit of relator and the answer together, and

we have this state of facts : That Seale commenced an action against the City of San Francisco, in the year 1854, in a Court of competent jurisdiction ; that he recovered judgment in the year 1857, and that said judgment was confirmed by the Supreme Court in the year 1860 ; the judgment was recovered against the City of San Francisco, and the Consolidation Act establishing the City and County of San Francisco went into effect in the year 1856, and during the pendency of the action ; that there is money in the city treasury, from the revenues of a past year, amply sufficient to pay this judgment.     On this state of facts the relator contends that he is entitled to a peremptory *mandamus* to compel the payment of his judgment.

I.     The former City of San Francisco and the present City and County of San Francisco are one and the same corporation, so far as debts, liabilities, judgments, suits, right to sue, and defend are concerned.

In *Seale* v. *The City of San Francisco*, the very case which is described in relator's affidavit, the direct point was raised and decided by this Court, so that, as far as this case is concerned, the matter is forever a *res adjudicata.*     The same point was taken in behalf of the City of San Francisco in the cases of *Argenti* v. *The City ; Chrysler* v. *The City*, and *Martin* v. *The City.*

This point was also decided in the case of *Smith* v. *Morse* (2 Cal. 554.)     The Act of April 15th, 1851, had repealed the Act incorporating the City of San Francisco, passed April 15th, 1850, and considerably enlarged the boundaries of the city, and the point was taken, " That the Act of April 15th, 1851, reincorporating the City of San Francisco, repealed the old corporation, and consequently its debts became extinguished and its property escheated to the State.     That the State, in the exercise of her sovereignty has reconveyed the property of the city to the Fund Commissioners, coupled with the condition of the payment of the floating debt of the city."     To this Murray C. J. said : " It requires no little courtesy to discuss this proposition seriously, even for a moment, and the whole mistake has grown out of a failure to distinguish the difference between the body politic as a corporation, and the act constituting it a corporation.     The title of the act is, " An Act to Reincorpo-

rate the City of San Francisco." The first section provides : " The people of the City of San Francisco shall continue to be a body politic and corporate under the name and style of the City of San Francisco.

" By the first charter the people of San Francisco are constituted a body politic ; the second continues—not destroys—the body so founded. In the language of Lord Mansfield, ' It has never been disputed that new charters revive and give activity to the old corporation. Where the question has arisen in which there was any remarkable metamorphosis, it has always been determined that they remain the same as to debts and rights.' * * * In fact the Legislature possesses no such arbitrary power to seize the revenues and property of a municipal corporation. If they had, by what authority— the debt having once been destroyed—can they again revive and impose it upon this city, and authorize a tax to be levied upon the corporators for its payment ? The construction contended for is at war with the plain and obvious meaning of the Legislature. And even if such were the intention, it would be but doing indirectly what I have already shown they cannot do directly, and would therefore be unconstitutional and void."

The Court will remember that in the case of *Smith* v. *Morse* an execution, issued on a judgment obtained under the charter of 1850, had been levied upon the property of the city under the charter of 1851, and the property had been sold. Large quantities of the water lots of the city are still held under this decision, and to disturb it would be to overturn the title to millions of dollars of property.

The identity of the City and County of San Francisco with the City of San Francisco was decided in a very striking manner in the case of *Knox* v. *Woods*, (8 Cal. 545.) There the Court held that an account audited against the City of San Francisco need not be audited again under the Consolidation Act to entitle it to be paid by the City and County of San Francisco.

How well this point was considered as settled is apparent from the case of *Zottman* v. *The City of San Francisco*, where the Court treats the liability of the City and County of San Francisco,

as a matter of course, for the debts of the old corporation. The Court there say : " The liabilities of the City of San Francisco having been cast by the Consolidation Act upon the defendants." (20 Cal. 100.)

This point therefore has been so often decided, directly and indirectly, that it is no longer an open one. Even, however, if it were, the decision must still be the same.

The language of the Consolidation Act is clear and unmistakable on this point. There is no ambiguity in the statute. The first section of the Consolidation Act declares that, " The corporation or body politic and corporate, now existing and known as the City of San Francisco, shall remain and continue to be a body politic and corporate, in name and in fact, by the name of the City and County of San Francisco, and by that name shall have perpetual succession, may sue and defend in all Courts and places."

Again, at the end of the first section : " *Provided, however,* that all rights and liabilities of the corporation, heretofore and now known as the City of San Francisco, shall survive to and continue against the corporations continued by this Act."

The objections most urged by respondents' counsel are : 1st, that the new corporation is entirely dissimilar to the old one in the powers which are conferred upon it; 2d, that the new corporation includes a larger space of territory, and that, although such fact is not proved and does not appear either in the record or law, there are persons included in the new corporation who were not in the old ; and 3d, that the new corporation includes the former corporation of the county, and that the corporation, the county, cannot be bound by a judgment against the city without having an opportunity of defending itself.

These objections may be answered together. A corporation is the creature of the Legislature, and under constitutional restrictions, is what the Legislature makes it. The Legislature has the right to consolidate two or more corporations into one, so that the composite corporation shall be legally identical with each of the corporations which have been put together. Thus, in American Railway Cases, 69, in the cases cited there, it was held that a railroad

company made up of four or five companies, formerly existing as distinct companies, was yet the same as each of the former companies.

So, also, the Legislature has the right to extend the territorial limits of a corporation. This was done in 1851, when the charter of 1850 was abolished and the limits of the city were extended. So, also, the Legislature can take away from a corporation all the powers, which it formerly had, and confer upon it entirely new and distinct powers, and yet the corporation remain the same. (See *Rex* v. *Pasmore*, 3 T. R. 241, 242, 246 ; 2 Mason, C. C. R. 43 ; *Hopkins* v. *Swansea Corporation, Mees & Welsby*, 621 ; *Ready and Banks' Executors* v. *The Mayor and Aldermen of the City of Tuscaloosa*, 6 Alabama, 336 ; *The Overseers of the Poor of the City of Boston* v. *David Sears*, 22 Pick. 122 ; *The City of St. Louis* v. *Thomas Allen*, 13 Missouri, 401 ; *Daniel* v. *Mayor and Aldermen of Memphis*, 11 Hump. 582 ; and *The State ex rel. Waring* v. *The Mayor, Aldermen, etc., of Mobile*, 24 Alabama, 701.)

II.   It is the duty of the City and County of San Francisco to pay the judgment held by the relator out of her revenues if she has sufficient on hand, and if she has not sufficient on hand, then to levy a tax for the deficiency in the manner pointed out in section four of the Consolidation Act ; and it is the duty of the Board of Supervisors to make provision for the payment of this debt.

1st.  The city has been sued in a Court of competent jurisdiction, and that Court has awarded its judgment.   It is ordered and adjudged that the city and county do pay.   To hold that a Court which has the power to command a corporation to pay its debts has no power to enforce that command, if it is disobeyed, is simply to take the case altogether from the hands of the Court. On what ground can this be done ?   Certainly not on the ground that Courts have not jurisdiction to enforce corporations to discharge their legal duties.   Certainly not on the ground that such judgments are not coercive in their effect.   If a municipal corporation is sued in ejectment and the plaintiff recovers, the

Sheriff coerces the city to leave the premises. A Court has, therefore, the right to enforce its judgments, and there is no exception in favor of money judgments. If, then, the Court has a right to enforce a money judgment, it must be by the only means possible in the case of corporations which raise their money by taxation, and that is out of their revenues, or, if there are none, by taxation. The right which the Courts have to order a thing done, necessarily carries with it the right to compel that thing to be done.

2d. Again, this power of the corporation to appropriate its revenues to the payments of its debts, is necessarily implied in its power to make contracts and incur liabilities. What is a contract? It is the assent of two minds, legally binding and enforceable on both. Now, the law which gives to a corporation the right to contract, gives to it the right to put itself in a position where it can be forced legally to comply, if it refuses. The Legislature, in giving to a corporation the right to make contracts and incur liabilities, and in subjecting it to the authority of the Courts to compel a performance of contracts and a payment of liabilities, by a necessary implication gives to the corporation the right to raise money in the ordinary and customary way for the purpose of meeting its contracts and liabilities, and, by an equally necessary implication, gives to the Courts the power to force it to raise money, if it refuse to comply with their legal commands.

3d. The Legislature has not only conferred indirectly this power on the corporation of the City and County of San Francisco, but it has also done so in the clearest and most unmistakable language.

By the act the liabilities of the City of San Francisco survive and continue. They have never died. Their position has never changed. Two stronger words, to have the effect which the Legislature evidently intended to have, that of saving these rights and liabilities from even a momentary abatement, could not be selected than these words—survive and continue. And for these liabilities a fund is provided, and that fund is the revenues of the City and County of San Francisco, and taxation if the revenues are insufficient; and that taxation is to be apportioned in the way which the Legislature evidently regarded as the equitable one, in a certain

proportion upon the inhabitants of the City of San Francisco and of the County of San Francisco.    And finally, the power and duty to do all this is devolved upon the Supervisors.

It is argued on the other side that all of these provisions are but simple declarations of good faith on the part of the Legislature; that it is a pledge that at some future time another act shall be passed giving to some one the power of paying these liabilities, but that the bill itself makes no such provision.

But it is clear that the Legislature intended, once for all, in this Consolidation Act, to make full provision for the payment of these liabilities.    It is clear from the monstrous injustice of the opposite construction that a Legislature should give all the property rights and franchises of the original corporation to the corporation as changed, and make no provision for its liabilities.

Examining the act in the light of common sense and justice, we see that the language is peremptory.    The liabilities are left as they were before.    Provision shall be made for their payment. The fund is provided.    The proportion which the city shall pay and the county shall pay is ascertained.    In other words, the very details of the manner and mode of payments are arranged.    How is all this consistent with the idea that the Legislature intended to do nothing at all except to say to the creditors, " At some future time we will pass a law containing these provisions."

If the Legislature intended to leave this subject to a future Legislature, and to do nothing about it itself, what right would it have to dictate how that Legislature should act.    If this is but a declaration that hereafter some act shall be passed making provision for the payment of these liabilities, in what way can the Legislature say, when that future act is, passed, that it shall contain a provision that the payment shall be made out of the revenues of the city and county, and that taxation shall be made in a certain way.    Evidently these two provisions : 1st, that these debts shall be paid out of the revenues of the city and county ; 2d, that taxation for this purpose shall be apportioned in a certain way, are not portions of a declaration that hereafter something shall be done; they are positive peremptory provisions as to the manner and mode of payment and of raising money for that purpose.

Again, such a construction would be unconstitutional. The former acts incorporating the City of San Francisco contained provisions for the payment of these very debts out of the revenues of the city, and directed that these revenues should be raised by taxation. (See Charter of 1850, art. 3, sec. 29 ; Charter of 1851, art. 3, secs. 7, 8, 13.)

It was on the faith of these provisions that the city was trusted. The relator's affidavit shows that this indebtedness accrued in 1854. The judgment creditor had, therefore, a vested right to be paid out of these very funds, to be raised in this very manner, and a subsequent Legislature cannot take away this right. (*English* v. *Board of Supervisors of Sacramento County*, 19 Cal. 172 ; *Smith* v. *Morse*, 2 Id. 524 ; *The People* v. *The Board of Supervisors of the County of Westchester*, 4 Barb. Sup. Court R. 64.)

It is, however, objected to this, that no machinery is provided and that the provision does not sufficiently indicate the mode and manner to make it practicable to carry it into effect.

To this we answer : 1st, that if the general power to make this provision for the payment of the debts, and to tax in a certain manner is given, such general power carries with it the power to take all the necessary steps. It is a general fundamental principle that where a right is given all necessary powers to the exercise and enjoyment of the right are also given. 2d. We answer that the machinery is provided, and the Revenue Act (see Stat. 1857, sec. 42, p. 339) provides how a tax shall be levied. All, therefore, that was necessary was to give to the Board the power to direct the tax.

Again, it is urged that section ninety-five of the Consolidation Act provides that payment of demands on the treasury of said city and county, duly audited, may be made for certain specified objects " and none other," (see Act of 1856, 172) and that this provision prohibits the application of the money in the treasury to the payment of these debts, as they are not specially mentioned.

To this we answer : 1st, that this provision only applies to the future government of the city, not to its past transactions ; and 2d, that in this provision as to what demands are to be paid out of the treasury, the act has omitted judgments altogether, for the clear

Frank *v.* City and County of San Francisco.

reason that it was unnecessary to specify them. The law orders the payment of judgments. The section only deals with those demands which the Supervisors and Auditor pass upon—with contracts which the law authorizes the city to make and then pay without suits.

It is further objected that our demand is insufficient. On this point we will simply call the attention of the Court to a very learned case in 8 Casey, 232.

III. *Mandamus* is the proper remedy to enforce the performance of the duty imposed upon the Supervisors. The jurisdiction of the writ comprehends the execution of the common law, of statutes and Acts of Parliaments, in all cases where there exists no legal remedy. Formerly the received idea was that a *mandamus* would lie only to command the performance of a ministerial duty ; but modern cases have gone much further, and it is now the constant practice to grant the writ to command the performance by any inferior jurisdiction of any public duty for which there is no specific remedy. (Tapping on Mandamus, p. 12 [side top] 64.)

The statute of this State gives the writ as freely as the English rule. It is unquestionable that municipal corporations are proper subjects of the writ. It is said in Tapping, 142, that it is within the jurisdiction of the Court to command, by *mandamus*, that all the officers of municipal corporations should do their duty in their respective offices, they being public officers.

The same rule applies to parishes. So it is said by the same author (page 257) that on a proper case being shown, the Court will grant the writ to collect and pay over rates, assessments, etc., and (page 259) to command parish officers to pay principal and interest borrowed, and to command the overseers of a parish within an union to pay their proportion of the expenses of the union to the Treasurer, and that if they have not sufficient funds in their hands for that purpose that they do forthwith what is necessary for making, collecting, and levying a rate for that purpose, and that they pay the amount thereof to the Treasurer. The following cases are cited to sustain the text: *R.* v. *Todmorden, overseers* (4 P. & D. 553) ; Id. (12 B. 185), where see form of writ, etc. ; *R.* v. *St. Andrews* (10 A. & E. 736). These and

44

many other cases are referred to with approbation by the Supreme
Court of Pennsylvania in a very learned and able opinion in the
case of *Commonwealth* v. *Pittsburg* (34 Penn. State R. [10 Casey]
496 ) ; see also *Commonwealth* v. *Alleghany Co.*, (32 Penn. [8
Casey] 218) directly to the point.  From these cases, and many
others which will be cited in the sequel, it will be seen that municipal
corporations are subjects of this writ; that the officers controlling
them are public officers, and therefore subject; and that in cases
precisely analogous to this they have been held to obedience to the
writ.  The principle is, that exercising functions with which the
law invests and charges them, they may be coerced to discharge
those functions according to law.

All of the authorities, without a single exception, maintain the
proposition that in the absence of any legislative direction to pay,
or to provide for payment of a municipal debt, the fact of the
existence of the debt without provision for its payment, when de-
mand is made and refused for such provision, is sufficient to author-
ize *mandamus*.  Upon principle, this is and should be so.  A
judgment is conclusive of the fact of indebtedness, and that the
corporation had a right to contract the debt; and the contracting
of it carries the obligation to pay, and with this the use of the
proper means to pay.  No higher duty can be imposed upon any
being, legal or artificial, than the duty of doing justice ; and if any
duty can be compelled by superior authority, it would seem to be
the duty of doing justice.  But positive authority is abundant to
support a principle so obviously just.  (*State* v. *Poulterer*, 16 Cal.
531; Sedg. on S. and C. Law, 91, 92; *Carroll* v. *Board of
Police*, 6 Cush. [Miss.] 38 ; *Board of Police of Attala County* v.
*Grant*, 9 S. & M. 92; *Taver* v. *Commissioners of Tallapoosa
County*, 17 Ala. 532.)

It is urged that the relator, having recovered his judgment,
might, for anything that appears, have enforced it, or might still
enforce it by *fieri facias* process entirely adequate to the purpose.

To this we reply : 1st, that there is no intendment in favor of a
municipal corporation—that it has leviable property sufficient to
pay its debts.  The petition expressly charges that the relator
has no adequate and sufficient remedy; and this charge is not

denied, and this is enough for all purposes of obtaining the writ. This has been expressly held in the two cases from Pennsylvania, above cited, to be all that is necessary.

2d. The other remedy, excluding this, must be a remedy for the enforcement of the very right claimed. Now, here we are not seeking to enforce the judgment, but to enforce the statutory duty cast upon the Supervisors of the city and county to pay the debts of the city, the Supervisors being in this respect the representatives of the old corporation. The statute cast the duty of levying a tax for the payment of these debts; the creditors had a right, therefore, to look to this fund for payment of their debt. Even if there were a clear remedy for the enforcement of the judgment, this would be no answer to this application, any more than it would be a good answer that the Sheriff need not execute a deed because there was property of defendant to make the debt. The judgment is one thing binding the old corporation; the duty to levy a tax to pay it is another thing, binding the new corporation; and we are seeking now to enforce this new statutory obligation, and for this last breach of duty we have no specific remedy, indeed no adequate remedy at all, except in this form.

3d. The primary fund for the payment of the debts of the old corporation is the money in her treasury, and the appropriate means to get it there taxation. The whole policy of the law, as shown in the old charter and the new, is that the public property shall not be sold to pay the debts. It is notorious that the city has no property subject to forced sale, except land; but she cannot sell that, or any property—she can only lease for three years. Can it be possible that the Legislature meant that the city should, by the mere failure to provide for the payment of these debts, as she is bound to do by the law, permit the public lands to be sacrificed at a forced sale by the Sheriff? Is it not a violation of the duty of the Supervisors to suffer the sacrifice? And can that be considered a legal remedy, adequate and sufficient, which thus contravenes this duty and imposes this unnecessary loss upon the city?

Another answer is, that the judgment itself, as held in the Mississippi case cited, taken in connection with the duty imposed by law, is a command for the levying of the tax; and still another, as

held in the Pennsylvania case, (8 Casey) that the number of the debts makes the process of sueing on them all at law an inadequate and inadmissible remedy—the argument being that it unnecessarily subjects the creditor to delay and the corporation to expense.    To all which it may be added that here the new corporation, having received the assets of the old, has contracted a direct engagement with the State and the creditors of the city to pay her debts ; and that this obligation is a different thing from the liability of the old corporation or of the old remedies—a new obligation and a new contract, with a new party, on a new consideration.    (3 Black. Com. 100 ; Tapping on Mand. chap. 3, pp. 9, 10 ; also citing 8 Casey Sup., Angel & Ames on Corp. sec. 707.)

It is also urged that inasmuch as provision can only be made for the payment of the judgment of the relator by the Supervisors by an ordinance, they cannot be controlled in the matter by *mandamus ;* that the right of voting necessarily implies a discretion as to how the vote shall be given, whether aye or no, which cannot be interfered with by the Court.

To this we answer, that most corporate acts require to be done by vote, or by some indication of the will of the members of the Board ; and if the argument be good, it must follow that *mandamus* could never, or at least very seldom, lie against a Board like this. But if the duty be plain, then the plain duty is to vote to do it. There is no discretion as to the mode of voting, when there is none as to the result.    If otherwise, then for all practical purposes these bodies would be despotic.    What was required of all the Boards in the large list of cases cited ?    What becomes of *English* v. *Supervisors of Sacramento*, where they were required to lay a tax ? and especially of the case of *O'Donnell*, and other cases in this Court ?

The Board is a unit, though composed of different members ; and though several persons act, yet those persons make but one body.    If one man or officer owed this duty, *mandamus* would lie ; but if several owe it, it will not—the remedy depending not on the right but on the number of people who compose the body owing the duty, and their mode of doing their business.    We deny that voting implies discretion any more than any other sort of corporate action. It may be doubtful whether, the duty being ministerial, any voting

is necessary to the payment of a judgment—the law in pronouncing the judgment being the highest mandate and authority for such payment.

The case of *The People ex rel. Lynch* v. *The Mayor, etc.,* of *New York* (25 Wend. 684) is cited. But it is not in point. There the claim was not on a judgment, and a judgment, for all that appears, would have been as effectual as *mandamus.* Here *mandamus* is the only effectual remedy to get the money. No intimation is made that *mandamus* would not lie to compel payment of a judgment. The suggestion about the appropriation, etc., has no application to this case — for here the direction is general to make provision for debts, etc., and no restriction placed on the action of the Supervisors, and no discretion given. Besides, the last paragraph of Judge Nelson's opinion is a mere suggestion of his and not necessary to the decision, and is wholly without foundation in law, as will appear by reference to late cases. It would deny a *mandamus* for any sort of refusal to pay money by a Common Council or any corporation, public or private. If effect were given to it, there can be no responsibility enforced when the liability is admitted, and the plainest duties cast by law upon such bodies. The doctrine would be equivalent to a Bankrupt Act for corporations.

But this dictum of Judge Nelson is controlled by the case of *Ex parte Lynch* (2 Hill, 45). This was another application by Judge Lynch for a *mandamus* to compel the Mayor and Supervisors of New York to pay his salary. Between the first application, reported in 25 Wend. 684, and the present one, an act had been passed by which the Mayor, etc., as Supervisors, are directed to audit and allow the salary of the Judge. The phraseology of the old act was amended; but the same official action, viz.: the passage of an ordinance by vote, was required to get the money out of the treasury as before. The Court say: " there would be no difficulty in granting the writ now," and then go on to rule that as the party has an adequate remedy by action, the writ of *mandamus* is denied.

The Court very properly held that where there was no discretion left by statute over the subject matter of the appropriation, the assent of a majority by vote could be coerced and directed by *mandamus.*

If, however, the Court think there is anything yet remaining in the remark of Judge Nelson worthy of consideration, we would call their attention to numerous cases more directly bearing on this point.   We merely refer to that large class of cases holding that a society may be compelled by *mandamus* to receive a member by vote whom they have expelled by vote, or have refused to admit by vote.   (1 Hill, 665 ; 24 Barb. 570 ; 12 Cush. 402.)

In the matter of *Bright* v. *The Supervisors of the County of Chenango* (18 Johns. 242) the Supervisors twice refused, and they must have refused each time by a vote, to allow the account of the Clerk of the county for advances made by him in purchasing books for records.   They were compelled by *mandamus* to allow the account ; that is, they were compelled to vote "yes" on a question on which they had voted "no" at two regular meetings.

In the case of *The People* v. *The Supervisors of Chenango* (4 Selden, 317) the Board had refused to issue warrants for the collection of the tax provided by the militia law.   On the application of the relators, writs of *mandamus* were issued to the Board of Supervisors, requiring them to reassemble and cause the military roll of the towns within the military command to be compared with the assessment rolls, and to issue warrants for the collection of the tax required by the act, and the judgment of the Supreme Court was affirmed by the Court of Appeals.

The case of *The People* v. *The Common Council of Brooklyn* was an application for a peremptory *mandamus* to compel the defendants to proceed in the matter of the widening of Fulton Street, in the City of Brooklyn, and to complete the same.   The Common Council had adopted a resolution to the effect that all proceedings in widening Fulton Street be discontinued, but a *mandamus* went to them commanding the defendants to proceed with the work.   (22 Barb. 404.)

But the late case (1861) of *The People* v. *The Common Council of Syracuse*, covers the whole ground.   This was a motion for a peremptory *mandamus*.   It appears that the Common Council passed a resolution directing the Commissioners to assess the amount awarded for damages to the owners of property taken for the opening of a street.   This resolution was vetoed by the Mayor, and

failed to command a majority sufficiently large to pass it against the veto.   The order of the Court was, that a peremptory *mandamus* should issue to the Common Council, requiring that body to proceed and direct the Commissioners making the award to assess the amount awarded for damages.   (20 How. Pr. 491 ; S. C. 32 Barb.)

The Court remark that, " while the Common Council have any discretion to proceed or to discontinue, this Court will not interfere to overrule their proceedings.   It is only when the Common Council neglect a plain duty enjoined by law, that this Court undertake to compel them to proceed by *mandamus*."

This is the only use of the word " discretion " in the case.   The point that the Supervisors had a discretion to vote " aye " or " no," was not alluded to by Court or counsel in this case or any of the preceding cases ; and the plain result of the *mandamus* in the last case was to compel a number of the Supervisors to vote " aye " on the resolution which had been previously lost, and on which they must have voted " no," sufficient to pass it over the veto of the Mayor, or to compel that functionary himself to vote " yes " on a resolution he had vetoed a little while before.

If voting is necessary, there can be no doubt that, since the Supervisors of the City and County of San Francisco are under obligation to do a specific act, which obligation has been determined beyond question or appeal by the highest record evidence known to the law, the action required is merely the exercise of a ministerial power, and the judgment of the city officials can be controlled and directed by *mandamus*.   (*Hempstead* v. *Underhill*, 20 Ark. 337.)

*D. Lake* and *J. W. Dwinelle*, for the Respondent.

I.   The existing corporation, " The City and County of San Francisco," is not identical with the former " City of San Francisco," and the judgment rendered against the former corporation is not binding upon the present one.

This is not a question involving a mere name.   The name may be changed and the corporation remain the same.   The name may remain the same and the corporation lose its identity.   If this act had merely continued that one corporation, with greater or smaller

territorial limits, or greater or lesser powers and capacities, we should not deny that the new or continued corporation was perfectly identical with the old, or to use the language of the act, (sec. 4) "the former city corporation." Such were the cases cited by appellant, and the same principle is announced in *Bellows* v. *President, etc., Hallowell Bank* (2 Mason, C. C. R. 31) ; *Rex* v. *Pasmore* (3 Durn. & East, 241) ; *Hopkins* v. *Swansea Corporation* (5 Mees. & Welsby, 621) ; and does not need reiteration. Such also was the effect of the former acts reincorporating the City of San Francisco. (Laws 1851, chap. 84, p. 357; Laws 1855, chap. 197, p. 251.) In those instances, the identity of the corporation was continued and maintained.

But in the case of the City of San Francisco under the Consolidation Act, there was effected, not merely the continuance of one corporation, but the continuance of two corporations, and not merely the continuance of two corporations, but the union of those two corporations into one. The City of San Francisco did not cease to exist as a corporation, but it continued its existence under the absolute condition of uniting with it another artificial person and corporate entity, whose existence and personality were as complete and distinct as its own. The new corporation, therefore, presented in its very essence a quality which rendered an actual identity with the "former corporation" impossible; for it represented not only the former corporation but more, and twice as much, and that not merely of territory, capacity, or property, but of distinct corporate entity.

By the act both of the corporations were declared to continue. Neither lost its identity, but that identity extended to only one-half of the new corporation; nor did either transmit any portion of its identity to the other. The only legal analogy to which the results of this union can be compared, as they are announced by the Legislature, is that of death and administration. The old city corporation, not only in name, but in form and essence, ceased to exist. It was continued *sub modo* under a new name, and in union with another corporation. The liabilities of the former corporations were declared to "survive" against the new dual corporation. All the property of the former corporations was transferred

Frank *v.* City and County of San Francisco.

to the new corporation. The new corporation therefore became the administrator of the two "former" ones, liable for all their debts and entitled to all their assets. But as not only another corporation was added to the "former corporation of the City of San Francisco," but also another and distinct body of corporators, it follows that this other corporation and new body of corporators, upon whom were thus thrown the liabilities of the former corporation of the City of San Francisco, had a right to contest those liabilities, so far as they had not become absolutely fixed by judgments already rendered, or audits already made, for two reasons: 1st, they had a right to the benefit of any excess of property conveyed to them above the liabilities imposed upon them; 2d, they had a right to protect themselves, if possible, against a deficiency of assets provided to meet those liabilities. How could this be done without the right to litigate pending suits not yet in judgment? And how could they be litigated, when the new corporation was not made a party to the record—only one-half of its constituent parts being represented in Court—and that when every law by which that half ever had the power to appear in Court at all, had been expressly repealed?

II. The Consolidation Act respecting the preëxisting liabilities of the City of San Francisco and those of the County of San Francisco, contains only a declaration of good faith towards the public creditor, but makes no specific provision for his benefit, and the Board of Supervisors have no power to pay him.

Two existing corporations were to be amalgamated by the Consolidation Act, and two classes of persons were greatly interested in the consequences of this change. The first class was composed of the creditors of the two corporations, who inquired: "How are our claims to be paid?" To this the Legislature answers: "Provision shall be made from the revenues of the said City and County for the payment of the legal indebtedness of the former city corporation, and of the County of San Francisco." (Consolidation Act, sec. 4.)

The other class was composed of the corporators of the County of San Francisco, living outside of the former City of San Francisco, who inquire in their turn: "Are we, who never contracted

these heavy city debts, to pay them?" To this the Legislature answers in the same section: "You shall never be taxed heavier than you were last year."

These two quieting declarations, so natural and so just, are now made the ground of an attempt to impose an immediate duty on the Board of Supervisors to make provision for the payment of these judgments. That this proposition is untenable appears in various ways:

1. The declaration is in the future: "Provision shall be made," not "the legal indebtedness of the city and county shall be paid as hereinafter provided."

2. No machinery is given by which such payment could be made, and no one mode indicated of the many by which provision could be made for it. Provision made? How? By payment in cash? By funded bonds? By receipt for taxes? By exchange for lands? By competition under sealed proposals? How?

3. Section ninety-five of the Consolidation Act (Laws 1856, chap. 125, p. 172) expressly provides that "payments of demands on the treasury of said city and county, duly audited, may be made for the following objects, and none others;" and then follows the enumeration of fifteen objects for which such payments may be made, among which judgments against the city are not included.

Nay more, by subdivisions 4, 5, 6, 7, 8, and 9 of that same section ninety-five, provision is made for the payment of the coupons and principal of the various then existing funded debts of the city and county, and by subdivision twelve for the payment of the then existing mortgage upon the City Hall. It seems, then, that neither the semi-annual interest upon the funded debts, nor the mortgage upon the City Hall could be paid out of the treasury, even after the declaration in section four, that provision should be made for their payment, without a further enumeration of each funded debt, and a specific provision for its payment. Why not? Because it was provided by the Consolidation Act that no payment could be made except "specifically authorized by this act." Laws 1856, chap. 125, p. 169, sec. 82, and by sec. 95, Laws 1856, p. 172 of the same act, no payments could be made except "for the following objects, and none others."

4. Those having judgments or liabilities against the former City of San Francisco, their counsel and the Legislature with its appropriate committees, have thought it necessary, from time to time, to apply for the passage of various acts to enable the Board of Supervisors to pay such judgments or liabilities. This is a universal, concurrent, cotemporaneous exposition of great authority. Such acts were passed by the Legislature in the following instances: O'Donnell's judgment against "The City of San Francisco" (Laws 1858, 191); Hays' Claim (Laws 1858, 325, 326); Shattuck's Claim against the City of San Francisco (Laws 1860, 28); Hayes' Claim (Laws 1860, 143); Duane's Claim (Laws 1860, 144); Duane's Claim (Laws 1861, 218). Why pass these enabling acts if the treasury was already open for the payment of these claims?

5. "Provision was made from the revenues of the said city and county for the payment of this legal indebtedness of the former city corporation," as provided by the Consolidation Act, for that act took effect on July 1st, 1856. By Laws of 1858, chap. 225, p. 183, provision was made for these liabilities by the passage of "An Act to provide for the Funding and Payment of the Outstanding Unfunded Claims against the City of San Francisco, and against the County of San Francisco, as they existed prior to the first day of July, A. D. 1856." The same act was reënacted so as to extend the time for presentation to a certain portion of the same claims by chap. 528, p. 598, Laws 1861; and finally, further "provisions" were made for this very class of claims now in suit, by chap. 244, p. 265, Laws 1862. Would the Legislature have "authorized" the present corporation to compromise its liabilities by the issue of funded bonds redeemable *in futuro* if the creditors had a right to instant provision for their payment?

6. By the Consolidation Act (Laws 1856, chap. 125, p. 168, sec. 81, as amended by Laws 1857, chap. 224, p. 253, sec. 1) all lawful demands upon the treasury, except those payable out of the School Fund and the Surplus Fund, after having been duly audited, presented for payment, shall be received for taxes at one per cent. above their par value. Now these judgments, which by the defendants' return amount to $1,500,000, are clearly not payable out of the School Fund, nor out of the Surplus Fund. (Consolidation

Act, sec. 95, subd. 15.)    Can it be supposed that the Legislature, by such a provision as this, authorized $1,500,000 in judgment to be audited, thrown into the market, and received for the current taxes of a single fiscal year, at a rate above par—enough to swamp the revenues of three successive years, and to reduce the municipal government to absolute beggary?

Against this vast accumulation of cotemporaneous construction is to be placed only the recent discovery of the relator, that he had a relief already within his reach, and that by the Consolidation Act (subd. 19, sec. 74) the Board of Supervisors have power " to provide by regulation, where it may be necessary, for carrying the provisions of this act into complete effect." But we are not pointed to any " provision of this act " which declares the duty of providing for the payment of these claims, while we do find that the legislative declaration of good faith has been carried out by other enactments, and the relator's learned counsel pass over with great neglect section ninety-five of the Consolidation Act, which absolutely prohibits the payment of these judgments out of the treasury.

III.    A *mandamus* will not issue against a public officer or corporation, except to compel the performance of a specific act clearly defined and enjoined by law, and which involves no discretion. (*The People ex rel.* v. *The Mayor, etc., of the City of New York,* 25 Wend. 680 ; Consolidation Act, secs. 68, 82, 84, 95 ; Statutes of 1857, 217.)

Even if it were conceded that this Court could make an order directing the Supervisors to make provision for the payment of the relator's claim, this would be the extent of its power ; it could not select the mode or prescribe the means by which provision should be made.    To do so would be a clear invasion of the legislative authority delegated by the State to the corporation of the City and County of San Francisco.    If it be the duty of the corporation to provide means for the payment of such claims as the present, that duty exists equally whether judgment has been obtained on them or not.    Claims to twenty times the amount of the present may now exist against the corporation, for the payment of which it is equally its duty to make provision.    But how shall such provision be made ?    By what kind of tax ?    By what rate of taxation ?

What class of claims shall be first provided for ?    Shall such tax be levied at the same time with the usual city and county taxes, or at some other time ?    Suppose a question arises as to the sufficiency of a certain rate of taxation to pay all the old existing indebtedness of the city, who is to determine the point ?    If all these details are subject to judicial control and direction, the Supervisors are *quoad hoc* mere puppets of legislators, exercising no discretion, possessing no choice between different plans of action, but speaking and acting simply as the Court directs.    It is impossible to conceive a more complete subversion of the legislative function.    And yet this is the course which the Court must pursue, if it directs the Supervisors to raise by taxation the amount necessary to pay the relator's claim.    The moment it enters upon the complicated question of ways and means all general directions are insufficient, on account of the wide discretion they necessarily leave to the officers of the corporation.    It was within the power of the Legislature utterly to abolish the old corporation, and deprive creditors of all remedy except an application for legislative relief.    But the greater power implies the less.    If they could deprive suitors of all remedy, they could compel them to accept payment of their debts in such manner as the Board of Supervisors might determine.    A discretion is committed to them in deciding how provision shall be made from the revenues of the city, and the exercise of this discretion being a legislative act cannot be controlled by the Court.

It is in effect granting a high privilege to the creditor to declare that when he cannot collect his debt from a corporation, such corporation, acting in a legislative capacity, shall make provision for the payment of his debt.    It is now asked that the Court shall go a step further, and usurping the legislative functions of the corporation, shall determine how such provision is to be made.

In *The People* v. *The Mayor*, etc. (25 Wend. 685) the Court say : " The nature of the power (to make appropriations for the payment of debts, *i. e.*, to ' make provision ' for their payment) necessarily implies the exercise of discretion, however plain the duty may be ; and where that exists in respect of the act complained of this remedy will not lie.    If this corporation, like a State, were exempt from suits at law, perhaps no remedy would

exist in behalf of the relator except an appeal to their sense of justice." (See also *King* v. *Bristol Dock Co.*, 6 B. & C. 181.)

Supposing the Court were to direct the Supervisors to make provision for the payment of the relator's claim out of the fund in the treasury, how could this be done without an interference with the legislative functions of the corporation ? May there not be equally meritorious claims existing in favor of other parties against this fund ? As no money can be drawn from the treasury except by ordinance, such a direction would be equivalent to a command to every Supervisor to vote for the ordinance, and to the Mayor to approve it. (Consolidation Act, sec. 68 ; *The People* v. *Mayor, etc.*, 25 Wend. 685.) The relator would thus obtain a preference of payment out of this fund over all other creditors, though his claim might be no more meritorious than theirs.

The whole question is one of legislative discretion on the part of the Board of Supervisors. Assuming, as we must in this case, that there are moneys in the treasury sufficient to pay the judgment held by the relator, (since it is so charged in his affidavit, and is not denied) what proceedings are necessary to get the money out of the treasury ? An ordinance must be passed by the Board of Supervisors, presented to the Mayor for his approval ; if disapproved, must be repassed by the Supervisors by an increased vote. Now, the question is, can a Court compel the Supervisors to pass such ordinance and the Mayor to approve it ? Most clearly not, without the most palpable judicial usurpation. An ordinance is voted on by ayes and noes, and the vote of each member is recorded. The right and duty of voting necessarily implies a discretion as to how the vote shall be given, whether aye or no. Nor is it in the power of the Court to dictate how the vote is to be given. Yet in this case the effect of a decision for the relator would be to compel each Supervisor to vote for an ordinance to pay this judgment under penalty of imprisonment. Nor is this all ; — should a majority defeat the ordinance, the innocent minority must be punished with the guilty majority.

FIELD, C. J. delivered the opinion of the Court—COPE, J. and NORTON, J. concurring.

On the nineteenth of April, 1856, the Legislature passed an act for the government of the City and County of San Francisco, commonly known as the " Consolidation Act." Its first section provides that the City of San Francisco shall continue a corporation by the name of the City and County of San Francisco, and possess the same rights and be subject to the same liabilities as before.    Its second section vests in the city and county the public buildings, lands, and property, rights of action, money, revenue, and income belonging either to the City or to the County of San Francisco.    Its fourth section enacts that provision shall be made from the revenues of the city and county for the payment of the legal indebtedness of the city, and also of the county ; and that in case it shall become necessary, for the purpose of providing for the city indebtedness, to increase the taxation beyond a designated rate, the increased taxation shall be levied and assessed upon property situated within the limits of the city, as defined by the charter of 1855, and not upon property outside of those limits.

At the time, and long before the act in question was passed, the City of San Francisco was indebted to one Henry W. Seale in an amount exceeding $58,000.    To recover this amount, Seale instituted suit against the city, which was pending when the Consolidation Act took effect.    In April, 1857, he recovered judgment in the Superior Court, and in July, 1860, on appeal to the Supreme Court, the judgment was affirmed.    This judgment has never been paid, and on the twentieth of October, 1862, it was duly assigned to the relator, who has ever since been its holder and owner.    Subsequently, on that day, the relator demanded of the Board of Supervisors of the City and County of San Francisco, in a regular and public session of the Board, to make provision for the indebtedness due on the judgment, in accordance with the requirements of the fourth section of the Consolidation Act.    The Board neglected and refused to make any provision on the subject ; and the present application is for a *mandamus* to compel that body to obey the law in this respect.    At the time of the demand there was in the treasury of the city and county, of the revenue of the fiscal year ending in June, 1862, a large amount of money, more than sufficient to pay the indebtedness upon the judgment, unspent and unappropriated.

The application is resisted on various grounds, several of which are unsupported by the facts of the case ; and to them we shall not give any consideration.  We shall only notice those which go to the merits of the proceeding.  The latter are substantially as follows :  *First :* That the existing corporation, "the City and County of San Francisco," is not identical with the former "City of San Francisco ;" and the judgment rendered against the city is not therefore binding upon the city and county.  *Second :* That the provision of the fourth section of the Consolidation Act, respecting the preëxisting indebtedness of the City of San Francisco, is a mere declaration of good faith towards the public creditors, and not a requirement imposing any duties upon the Supervisors ; and, *Third :* That *mandamus* is not the appropriate remedy to enforce the claim of the relator.

1.  The first position is answered by the language of the act, which is clear and unmistakable.  The corporation—the City of San Francisco—is not destroyed, but continued.  Its name only is changed, and the change in this respect did not require any alteration of the pleadings, nor any suggestion upon the record.  If, pending a suit against an individual, the Legislature should change his name, the fact would not abate the suit, nor call for any special action on the part of the adverse party, or of the Court.  Where any change is suggested, the vital question is not one of names, but of persons—is the same individual, whether natural or artificial, in existence ?  If this can be answered in the affirmative, the case is not abated, but proceeds to its final disposition.

2.  The provision of the fourth section is not a mere legislative declaration of good faith toward the public creditors.  It is not a mere pledge that, at some future period, provision shall be made by the Legislature for the payment of the previous indebtedness of the city.  The language is that of command from a superior to an inferior body.  The act declares that the liabilities of the city shall survive and continue ; it vests all the public property, revenue, and moneys of the city in the city and county ; it places the government of the city and county in the hands of the Supervisors ; and it declares that provision *shall* be made for the payment of the debts of the city, and designates the source from which the pay-

Frank *v.* City and County of San Francisco.

ment shall be made—" from the revenues " of the city and county. It even looks to the possibility of taxation above a designated rate, and directs the mode in which, in that event, the increased taxation shall be levied. It is impossible, without a violation of the most obvious rules of construction, to view the clause in question in any other light than as a command to be obeyed, and not as a promise to be subsequently carried out by future legislation.

The construction for which the respondents contend would convict the Legislature of intending to do manifest injustice. Their theory is that the Legislature has taken from the original corporation all its rights and property, and vested them in a new and different corporation, and thus deprived the creditors of all means of enforcing payment of their debts, and in return has simply given them the assurance that some future Legislature, the action of which it could not control, would provide for their case and render them justice. It would require very clear language to induce the Court to attribute any such purpose to the Legislature. A provision adopted with that view would hardly be characterized as a " declaration of good faith." We do not think that the Legislature designed any such purpose. We do not think that it ever intended by the act in question to postpone indefinitely the payment of the existing liabilities of the city, and to mock the creditors with a promise that they should ultimately be provided for by some uncertain action of some future representatives of the people.

3. *Mandamus* is the appropriate remedy to enforce obedience on the part of the Supervisors to the legislative command. In issuing it the Court does not assume the province of controlling their discretion, where that exists. But here the Supervisors have no discretion, except between two courses of procedure. They must provide for the payment of the just debt of the relator, established by the highest record evidence known to the law. They must appropriate the money from the revenues of the city and county already in the treasury, or they must raise the money by taxation. Their authority is ample, and their duty plain. And it would seem that no direction from a Court ought to be considered necessary to induce the performance of so manifest a duty with reference to

45

the just obligations of the City of San Francisco. The delay in doing justice has already swelled the amount of the relator's claim from fifty-eight to over one hundred thousand dollars, independent of the necessary expenses incurred by the city and county in attempting to avoid liability. That liability having been determined, no reasonable excuse can be offered for further delay on the part of the Supervisors in making the provision directed by the statute.

The ninety-fifth section of the Consolidation Act does not apply to judgments recovered upon the preëxisting indebtedness of the city. Such judgments can acquire no additional validity by being audited, nor is provision the less to be made for their payment because of the restrictions of that section and of other clauses of the act. However broad the terms of the section in question, or of other clauses, they must be read in connection with the fourth section, and receive such a construction that the provisions of all may stand, and right and justice be done.

It is of no consequence that the mode in which the provision shall be made—the machinery for effecting the payment—is not specially pointed out by the act. The legislative command is to make provision for the payment from certain sources. The duty carries with it the means. In imposing the duty upon the Supervisors, the Legislature authorized them, without further designation, to take all the ordinary measures essential to its complete performance. They can appropriate from the revenues; they can levy a tax; and the adjusting of the details is a mere matter of administration which can be had under the direction of any of the officers of the corporation specially designated for that purpose. (*Commonwealth* v. *Commissioners of Alleghany County*, 8 Casey, Penn. 218; *Commonwealth* v. *Pittsburg*, 10 Id. 496; *Maddox* v. *Graham et al.*, 2 Metcalf, Ky. 57.)

It follows that the judgment of the Court below must be reversed, and that Court directed to issue a peremptory *mandamus* in accordance with the prayer of the petition of the relator; and it is so ordered.

Frank *v.* City and County of San Francisco.

The Respondents filed a petition for rehearing, upon which Cope, C. J.* delivered the opinion of the Court—Norton, J. concurring.

The petition for a rehearing in this case must be denied. The point suggested in it was fully considered when the case was decided. The provisions of the Consolidation Act in regard to the payment of the indebtedness of the city are mandatory and imperative, and the Supervisors have no discretion upon the subject. It is provided, in the first place, that the indebtedness of the city shall continue against the city and county, and in the second place that provision shall be made from the revenues for its payment. There is a general provision giving to the Supervisors the power to provide by regulation for carrying the act into complete effect. The idea that further legislation is contemplated has no foundation to rest on. The act declares in plain words that "provision shall be made," and the power to make it is conferred upon the Supervisors, and not reserved to the Legislature. The language is unambiguous, and the intention clear, and the duty enjoined is one which the Supervisors have no right to disregard, and cannot refuse to perform. They are the creatures of the act, and whatever the act requires of them they are bound to do; their duty is simply that of obedience. They must do what the act enjoins, and refrain from doing that which it prohibits, and their duty is no plainer or more imperative in the one case than in the other. The fact that the duty required of them involves the passage of an ordinance makes no difference; the duty itself is no less incumbent upon them because they must perform it in a particular way. It certainly cannot be that a duty positively enjoined may become a matter of discretion by reason of the character of the proceedings necessary to its proper discharge. There is a suggestion to that effect in the case of *Lynch* v. *The Mayor, etc., of the City of New York* (25 Wend. 680) but it is entirely unsupported by either principle or authority. The case was an application for a *mandamus* to compel the payment of the plaintiff's salary as a Judge, and the decision was put mainly upon the ground that the plaintiff had an adequate remedy by action. In a subsequent case between the same par-

---

* See note to page 667.

, ties, the application was denied on that ground exclusively, the power of the Court to issue the writ and compel obedience to it being expressly affirmed. (2 Hill, 45.) It is true the Legislature had interposed, and directed the auditing and allowance of the salary, but the duty thus enjoined was regarded in the former case as existing under the law as it then stood. On the point in question, therefore, the latter case is an overruling authority, and there is, in our opinion, no doubt of its correctness. The present case differs from it in the fact that the application is based upon a judgment, and nothing remains but the duty of payment. This duty is cast upon the Supervisors, and the mode of discharging it clearly pointed out, and whatever is required for that purpose they must do. If an ordinance is required, they must pass it, and it is no answer to say that the passage of an ordinance is a legislative act implying discretion. There being no discretion as to the duty to be performed, there can be none as to the use of the means required in performing it. It is said that in passing an ordinance the assent of a majority of the Supervisors is necessary, and that there is no power in the Courts to compel them to give it. They act in such cases by vote, and the argument is that the right to vote includes the right to vote either for or against, according to the will of the voter. This argument, as applied to the case of an imperative duty, is manifestly erroneous, and we see nothing in it which is not met by what has already been said on the subject of discretion. In the absence of discretion as to the thing to be done, the Supervisors have no volition except to do it, and to assert the contrary is to assert that their will is superior to the law. We cannot dictate the action to be taken, but we can compel them to act, and their duty is too plain to be misconceived. It consists simply in making provision for the payment of the debt, in accordance with the mandate of the Legislature. The revenues are designated as the source of payment, and they must either appropriate the amount from moneys in the treasury, or levy a tax to obtain it.

In support of these views, and in further elucidation of the subject generally, we propose to examine a few authorities. In the case of *Thomas* v. *The Commissioners of Alleghany County* (32

Penn. 218) a *mandamus* was issued to compel the Commissioners to make provision for the payment of the interest on certain bonds of the county. The bonds were given in pursuance of an Act of the Legislature authorizing the county to subscribe to the capital stock of the Pittsburg and Steubenville Railroad Company, and to borrow money to pay the amount of such subscription. The Commissioners were empowered to make provision for the principal and interest of the money so borrowed, as in other cases of loans to the county ; and the Court held that the existence of the power created a corresponding duty which the Commissioners were bound to perform. The case of *Hamilton* v. *The Select and Common Councils of the City of Pittsburg* (34 Penn. 496) establishes the same principle, and the question of the remedy by *mandamus* is discussed in the opinion of the Court with much ability. The writ was asked to compel the two councils to make provision, by the assessment and collection of a tax, for the payment of the interest due on money borrowed by the city to pay a subscription to the stock of the Chartiers Valley Railroad Company. The act under which the money was borrowed vested in the city the power to make provision for the payment of the principal and interest by the assessment and collection of a tax, and a different act gave to the Select and Common Councils a general power to assess and collect taxes for the use of the city. It was objected on the argument that neither of these acts imposed a duty upon the Councils to assess and collect the tax, but the Court overruled the objection, and said : " It is absurd to argue that conferring such a power is imposing no duty. The Select and Common Councils are public agents, created to perform a public trust. One of the purposes of their creation is, that they may provide for the payment of the debts of the city. It is true the Act of 1853 only declares that the city shall have power to make provision for the payment of the principal and interest of the money borrowed, by the assessment and collection of a tax ; but in a statute the word *may* means *must* or *shall,* in cases where the public interest or rights are concerned, and where the public or third persons have a claim *de jure* that the power shall be exercised. The duty of the city is therefore imperative to assess and collect the tax, and the power and corresponding duty are, by

one of the acts referred to, devolved upon the Select and Common Councils." In *Maddox* v. *Graham & Knox* (2 Met. Ky. 56) the Common Council of the City of Maysville had been authorized and required to levy and collect a tax for a particular purpose, and it was held that *mandamus* was the proper remedy to compel performance of that duty. The Court, after stating the facts and citing a number of authorities, said: " We have had occasion to observe that the supreme law-making power of the State has given power to and imposed an obligation on the City Council to do a particular act, and that no specific remedy had been provided for non-performance. Certainly, according to the authorities cited, the Court will, in order to prevent a failure of justice, grant the writ to command the doing of the act enjoined by the statute." In *Carroll* v. *The Board of Police* (28 Miss. 38) a *mandamus* was awarded requiring the defendants to raise by taxation an amount sufficient for the payment of a claim which they had previously audited and allowed. On the question of remedy the Court said: " It has been argued on behalf of the defendants, that the relator had a full and complete remedy, either by bill in equity or by an action at law. This argument has already been incidentally met in considering other points made in the defense. The manner in which and the tribunal before which a claim against a county must be enforced are clearly defined by the statute. This tribunal has long since acted in regard to the claims now in controversy. They have been as definitely ascertained, and judgment directing their payment as clearly pronounced, as it is possible for any other Court, even if it had jurisdiction, to pronounce a judgment in the premises. There is no unsettled or open question as to the amount to be paid, but only whether the sum already adjudged shall be paid as directed by the order of the Board of Police. The question is, by what means shall this judgment be enforced ? It has already been said that the Board of Police by their judgment tacitly agreed to provide the means, in the mode pointed out by law, with which to pay the warrants directed to be issued on the treasury of the county. Indeed, such was the nature and operation of the judgment itself. If a suit could be maintained at all at law, it would be against the members of the Board as individuals for failing to discharge their

duty as public officers in levying the tax required by law to pay the debt of the county. This might be, to say the most, a very inadequate remedy to the creditor. He, in making his contract, trusted to the ability of the county to meet the engagement, and not to the individual responsibility of the members of the Board of Police. The county, by the contract, became his debtor, and it is to the party trusted that he has a right to look for payment. The Board of Police, as the public agents of the county, and as the officers of the law, undertook to do what was necessary and required of them by law, to compel the county to execute the contract. As public officers they have failed in discharging their duty in this respect. As public officers their action is still necessary to enable the creditor to get his rights, as adjudged and settled by the Board of Police, and the question is, whether there is any other remedy than that by *mandamus* which can accomplish this object. If there be any other, counsel have failed to point it out, and it is certainly unknown to the jurisprudence of this State. There is, therefore, no doubt as to the remedy."

These cases are but examples of what has been said and done by the Courts generally on this subject, and there is no ground upon which the case at bar can be distinguished from them in respect to the remedy sought. In all of them, and in many more which might be cited, the writ was directed to municipal bodies similar in their organization to the Board of Supervisors, and it has never been doubted that such bodies were subject to the control of the Courts in respect to the duties enjoined upon them by law. The rule to be collected from the cases is, that where a statute gives power to or imposes an obligation on a particular person or body, to do a particular act or duty, and provides no specific legal remedy in case of nonperformance, the Court will, in order to prevent a failure of justice, grant the writ to command the doing of such act or duty. It is obvious that the case before us falls within this rule, for the statute not only gives the power, but expressly imposes the obligation, and the plaintiff has no other remedy, either under the statute or independent of it, by which he can obtain the benefit intended to be secured to him. The debt belongs to the class referred to in the statute, and the duty of providing for its payment is devolved

upon the Supervisors, and the plaintiff has a right to demand that this duty shall be performed ; the only and consequently the proper remedy to compel it being that by *mandamus*.    We regard the case as a very plain one, and are entirely satisfied with the conclusion previously arrived at.

The petition is denied.